**INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 3233, et al, Plaintiffs,**

v.

**FRENCHTOWN CHARTER TOWNSHIP, Defendant.**

No. 2002–601456.

United States District Court, E.D. Michigan.

Jan. 27, 2003.

David Radtke, Southfield, MI, Kary L. Moss, Alison L. Paton, Detroit, MI, for plaintiffs.

Arthur H. Siegel, Frederick Lucas, Onsted, MI, Kerry L. Bondy, Monroe, MI, for defendant.

**OPINION AND ORDER OF THE COURT GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BATTANI, District Judge.

I.  INTRODUCTION

Before the Court is Plaintiffs' Motion for Summary Judgment.  Plaintiffs allege that Defendant Frenchtown Township's Ordinance 158–2 and Fire Department Personnel Policy § 38 violate the First Amendment by restricting fire department employees' communications with the media and public.  In this motion, Plaintiffs assert that both Ord. 158–2 and § 38 violate the First Amendment as a matter of law because they are unjustified prior re-

straints on the firefighters' right to comment on matters of public concern. Frenchtown responds by arguing that the two contested directives 1) do not restrict communication on matters of public concern, 2) do not act as prior restraints on speech, and 3) are justified even if they do infringe on the firefighters' First Amendment rights. The Court finds that Frenchtown's restrictions on speech violate the First Amendment and therefore grants Plaintiffs' motion for summary judgment.

## II. STANDARD OF REVIEW

F.R.C.P. 56 states that summary judgment "shall be rendered forthwith if the pleadings, [etc.,] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56. There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the movant must show that it would prevail on the issue even if all factual disputes are conceded to the non-movant. Additionally, for the purposes of deciding on a motion for summary judgment, a court must draw all inferences from those facts in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, in the instant case, this Court evaluates this motion with the rule that it should defer to Frenchtown's factual account whenever that account clashes with Plaintiffs'. The Court keeps in mind, however, that Frenchtown "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial" *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505

(internal quotations and citation omitted). In other words, Frenchtown still has the burden of presenting facts that support its claims. As long as Frenchtown has presented such facts, however, it will get the benefit of the doubt in any factual disputes with Plaintiffs.

## III. BACKGROUND

In November 2001, Frenchtown amended Ordinance 158–2 to state the following: "The Fire Chief... shall be the only authorized person who may release facts regarding fire department matters, fires or other emergencies to the news media. All other personnel shall refer all media inquiries to the Chief... All questions, concerns or issues regarding the policies, procedures, practices and/or operation of the fire department shall be first addressed to the appropriate Union representative. The Union representative and/or executive committee for the Union shall address the issues to the Chief." Ord. 158–2 goes on to explain the procedure if the Chief cannot properly address the issue. An individual violating the Ordinance faces a potential fine of up to $500 and/or a potential jail sentence of up to ninety days.

In December 2001, the Michigan Department of Consumer & Industry Services General Industry Safety Division found the Frenchtown Fire Department to have violated MIOSHA rules regarding training, incident command and organizational structure. A newspaper reporter approached Robert Gerlach, the President of the International Association of Firefighters Local 3233 (hereinafter "IAFF"), to ask him about the alleged MIOSHA violations, but Gerlach claims to have not responded for fear of being prosecuted under Ord. 158–2. IAFF, Gerlach and Ronald Hoskins, IAFF Vice President, sought in their original complaint to invalidate Ord. 158–2 as a violation of the First Amendment that hampers their right to

speak on matters of public concern. Andrew Van Slambrouck, a non-employee of the Fire Department, joined the suit as a citizen of Frenchtown who wishes to have access to information allegedly withheld from him as a result of Ord. 158–2.

During a September 2002 hearing before this Court on Plaintiffs' Motion for Preliminary Injunction, Frenchtown brought up the existence of § 38, which provides: "No information relative to the business or policy affairs of the fire department shall be furnished to persons not connected therewith, except as authorized by the Fire Chief pursuant to the Freedom of Information Act." Plaintiffs contend that before the September 2002 hearing, Frenchtown had always construed § 38 to prohibit only communications from the firefighters to the public on FOIA matters, but that Frenchtown's interpretation of § 38 at that hearing was much broader, basically barring the firefighters from talking to the public at all about anything having to do with Fire Department Affairs. Specifically, Frenchtown argued at the September hearing that § 38 was more restrictive than Ord. 158–2: "the ordinance is, I guess if I had to pick between the two, I'd say the ordinance is better for the plaintiffs than… the policy manual is, because the ordinance allows them to talk to everybody except the media." Prelim. Inj. Tr. at 17. Plaintiffs subsequently amended their complaint, alleging that § 38 also violates the First Amendment. In this motion, Plaintiffs are asking that the Court find both § 38 and Ord. 158–2 (hereinafter referred to collectively as "the restrictions") as unconstitutionally restrictive.

## IV. DISCUSSION

### A. The Standard for Evaluating Restrictions on Government Employee Speech

As an initial matter, the parties agree that for a public employee to prevail on a First Amendment claim against his employer, the employee must satisfy both of the following elements: 1) the restricted speech addressed a matter of public concern, and 2) the interest of the employee (and perhaps the public) in speaking on the matter outweighs the employer's interest in enhancing public services through the restriction. *E.g., Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 897–98 (6th Cir.2001).

### B. The Restricted Speech Includes Matters of Public Concern

Plaintiffs argue that "Fire Department matters" is a subset of speech that is generally of public concern. Plaintiffs offer two particular topics of public concern on which they claim to have been deterred by the restrictions from speaking: the Fire Department's MIOSHA violations and labor-relations matters within the Fire Department. The potential violation of the law by government and public organizations is clearly a matter of paramount public concern. *E.g., Charvat v. Eastern Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 617–18 (6th Cir.2001); *Perry v. McGinnis*, 209 F.3d 597, 605 (6th Cir. 2000). Likewise, labor disputes, and discussions surrounding collective bargaining, are also matters of public concern. *Bartnicki v. Vopper*, 532 U.S. 514, 533–34, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001); *accord County Sec. Agency v. Ohio Dept. of Commerce*, 296 F.3d 477, 486 (6th Cir.2002).

Frenchtown argues that Ord. 158–2 enacts only two types of restrictions, neither of which infringes the rights of employees to speak upon matters of public concern. The first sentence of the Ordinance only restricts the release of facts to the media, and Frenchtown apparently contends that only restricting the dissemination of facts

is not really a restriction at all. Frenchtown's line of argument seems to be that Ord. 158–2 merely restricts the conduit of facts to the media to the Fire Chief only, and thus the facts still get out to the media. The second restriction enacted by Ord. 158–2, according to Frenchtown, is simply a pre-clearance mechanism for dealing with issues before they become public. Frenchtown insists that this restriction naturally follows from the Township's obligation to deal exclusively with the Union on employment condition issues. With respect to § 38, Frenchtown states that the internal operations of the Fire Department are not a matter of public interest. As evidence for its statement, Frenchtown points out that § 38 has been on the books for eleven years without any complaint, violation or other incident.

Regardless of how long § 38 has been on the books, the speech affected by the restrictions clearly touches upon matters of public concern. As an initial matter, Plaintiffs are correct that speech dealing generally with "the policies, procedures, practices and/or operation of the fire department," or "the business or policy affairs of the fire department," covers topics of public concern. Cases from the various Circuits confirm that the performance of public works and agencies, including the fire department specifically, is of public importance.[1] Moreover, Plaintiffs are correct that speech surrounding the MIOSHA violations is of special public concern because it deals with a public agency's actions in accordance with the law. *E.g.*, *Charvat*, 246 F.3d at 617–18. Finally, as the citation to *County Sec.*

*Agency* makes clear, collective bargaining is a matter of public concern.

Frenchtown's arguments in response are unpersuasive. First, the argument that Ord. 158–2 only restricts the release of facts to the media does not make the Ordinance any less of a restriction on publically important speech. Frenchtown does not cite any caselaw in support of its proposition that facts are somehow less protected than opinion. Such a proposition seems extremely unwise given the difficulty of discerning fact from opinion in this context. For example, if a firefighter were to tell the media that firefighter training was inadequate and give supporting information, would that be an opinion or a fact substantiated by the MIOSHA citations? Indeed, the cases cited above clearly reveal that discussions of facts fall within the ambit of issues of public concern. In *Harman*, 140 F.3d at 116, for example, the plaintiff was punished for saying, "The workers who are considered the best workers are those who seem to be able to move cases out quickly," and "There are lots of fatalities the press doesn't know anything about," both statements of purported fact. The Second Circuit, as noted above, found both of these statements of fact to be protected speech on matters of public concern.

Frenchtown spent a great deal of time at oral argument trying to narrow the scope of its "fact restriction," basically contending that the Ordinance was crafted only to prevent firefighters from making unauthorized official statements on behalf of the Fire Department. It even implied

---

1. *E.g.*, *Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir.1999) (preparedness of the fire department "goes to the core of what constitutes speech on matters of public concern"); *Harman v. City of New York*, 140 F.3d 111, 117–18 (2nd Cir.1998) (policies and practices of New York's Children's Services and Human Resources Agencies were matters of public concern); *Sanjour v. Environmental Prot. Agency*, 56 F.3d 85, 93 (D.C.Cir.1995) (addressing "current government policies," in that case of the EPA, is a "paradigmatic matter of public concern").

that *any* statement by a firefighter, no matter how seemingly fact-laden, could escape the ambit of the Ordinance by being prefaced with the qualifier "In my opinion..." The Court is not persuaded by Frenchtown's attempt to narrow the scope of its restrictions, because this seems to contravene the clear language of the Ordinance, which covers *all* facts. If the Ordinance was simply meant to curtail unauthorized "official" announcements, it could have explicitly done so without restricting dissemination of all facts to the media. The slippery slope upon which the fact/opinion distinction sits makes the Ordinance too restrictive to pass constitutional muster.

Frenchtown's second argument, that the Ordinance does not suppress speech because the facts get out anyway through the Fire Chief, fails because it does not refute the contention that the facts in question are of public concern. If this argument has any relevance at all, it is relevant to the question of how justified the restrictions are, not to the question of whether the restricted speech is of public importance. Frenchtown's argument that the rest of Ord. 158–2 only sets up a preclearance review process is similarly irrelevant. Even if Ord. 158–2 is only a mild restriction, it is nonetheless *a* restriction on publically important speech.

Frenchtown also argues that the preclearance review is necessitated by the collective bargaining agreement. The Supreme Court has already rejected an identical argument, however, in *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 173–75, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). In *City of Madison*, the Supreme Court was asked to uphold a statute restricting a teacher's right to speak about collective bargaining issues at a School Board meeting. The statute was justified on the grounds that the teacher's speech could be construed as negotiation, violating the Union's exclusive position as bargaining representative for teachers. The *City of Madison* court rejected this justification, holding that the interest of safeguarding the negotiation process could not be used as an excuse to prevent the teacher from speaking on a matter of public concern: the teachers' collective bargaining situation.

Finally, regarding § 38, Frenchtown's bald assertion that the "internal" policies of the Fire Department are not of public concern is flatly contradicted by the caselaw cited above. Moreover, the absence of any complaint about § 38 for the past eleven years is explained by the fact that Plaintiffs were not informed of § 38's restrictive nature until the September hearing before this Court. In conclusion, the speech restricted in this case is of obvious public concern.

C. The Balance of Interests Favors Plaintiffs

1. The Proper Balancing Standard: *NTEU*

Plaintiffs call for a heightened level of scrutiny to be applied to the restrictions on the grounds that they are prior restraints on the firefighters' speech. Plaintiffs point out that the threat of punishment for violations of the restrictions acts as a before-the-fact deterrent to firefighters who want to speak out on department-related issues. Thus, Plaintiffs, conclude, the restrictions chill speech from ever being uttered, and Frenchtown must be held to a heavier burden in imposing those restrictions. Specifically, Plaintiffs argue that, in evaluating the constitutionality of the restrictions, the Court must apply the test enunciated in *United States v. National Treasury Employees Union*, 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d

964 (1995) (hereinafter *"NTEU"*). The *NTEU* test is particularly onerous to the government employer: "The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *Id.* (internal quotations omitted).[2]

Frenchtown argues that its restrictions are not a prior restraint because they do not prevent speech before the fact, but merely put employees on notice of the potential repercussions of that speech. According to Frenchtown, heightened scrutiny based on prior restraint is only appropriate where the speaker is actually prevented from speaking (i.e., where the speaker is physically kept from speaking or a press is shut down before printing), not where the speaker has simply been given disincentives for speaking. Frenchtown contends that because the restrictions do not act as a prior restraint, they must be evaluated under the more lenient *Pickering* standard: the Court must "balance ... the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it employs through its employees." *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■■ Frenchtown is correct that the *Pickering* test is the one normally used for evaluating restrictions on public employee speech by government employers. *Pickering*, however, is only applicable where the employee has been punished after speaking in an *ad hoc* disciplinary action. When, in contrast, the restriction on speech takes the form of a pre-speech threat of punishment that deters employees from engaging in the speech, the proper test is the more stringent one elucidated in *NTEU*. The *NTEU* standard is harder on a government employer than the *Pickering* standard in at least two important ways. First, whereas the *Pickering* test only requires the Court to weigh the punished employee's interest in speaking against the government, the *NTEU* test weighs against the state the combined interest of *all* employees whose speech is restricted by the rule *plus* all members of the public who would have an interest in hearing the restricted speech. Secondly, under *Pickering*, the government need only show how the punished employee's speech may have affected the efficiency of public services, while under *NTEU*, the government must show that the speech being restricted *necessarily* would have impacted the *actual* operation of the government. In this way, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475, 115 S.Ct. 1003.

■ Frenchtown's restrictions are clearly of the character contemplated in *NTEU*, and therefore this Court must use the more exacting *NTEU* level of scrutiny in evaluating Ord. 158–2 and § 38. The *NTEU* court confined the *Pickering* test to cases which "involve a *post hoc* analysis of

**2.** Peculiarly, however, Plaintiffs' brief does not quote the *NTEU* standard, but rather quotes the more deferential *Pickering* standard. The *Pickering* standard, which states that the Court must balance only the interests of the employee in commenting on matters of public concern against the interests of the State in promoting the efficiency of its provision of public services, is actually the one used for evaluating post-speech termination of a public employee that did *not* involve prior restraint.

one employee's speech and its impact on that employee's public responsibilities." *Id.* at 467, 115 S.Ct. 1003. It specifically declined to extend *Pickering* to cases like the one at bar, in which the Court is faced with a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* Because Frenchtown "chills potential speech before it happens," the *NTEU* test is the applicable one here. *Id.* at 468, 115 S.Ct. 1003.

Post-*NTEU* cases from several Circuits have unanimously applied the more exacting standard to restrictions like the ones at issue here. For example, the Second Circuit applied the *NTEU* test to a New York Police Department policy prohibiting officers from wearing their police uniforms when marching in a parade as members of an unrecognized ethnic police organization. *Latino Officers Ass'n, N.Y., Inc. v. The City of New York*, 196 F.3d 458, 461 (2nd Cir.1999). The *Latino Officers* court rejected New York's argument, identical to Frenchtown's here, that *NTEU*-level scrutiny was inappropriate because the policy only punished marching in the parade after the fact and was therefore not a prior restraint. *Id.* at 465.[3]

In its argument against a more burdensome standard for its restrictions, Frenchtown relies on a pre-*NTEU* case, *Moore v. City of Kilgore, Tex.*, 877 F.2d 364, 392 (5th Cir.1989), which refused to apply heightened scrutiny to a Fire Department Rule prohibiting firefighters from speaking to the media about fire department issues without authorization from the Chief. The *Moore* court held that because the Rule only punished the speaking firefighter after the fact, rather than somehow preventing speech outright, it did not act as a prior restraint and therefore did not warrant a heavier justificatory burden for the government. Although *Moore* does seem to support Frenchtown's position, it was decided prior to *NTEU* and therefore did not have that precedent to follow; to the extent that *Moore* conflicts with *NTEU*, this Court must follow *NTEU* and apply the more exacting standard.

### 2. Applying the *NTEU* Test

■ Plaintiffs argue that Frenchtown has provided no evidence that the performance of the Fire Department will actually suffer from allowing the speech that is currently prohibited by the restrictions. In fact, Plaintiffs point out that prior to the passage of the Ordinance, Gerlach had been making comments to the media that would now be covered by the Ordinance, and Plaintiffs claim that the Fire Department cannot point to any adverse effect on its services as a result of those comments. Plaintiffs go on to assert that even if Frenchtown could assert some kind of interest in preventing disruption and workplace inefficiency, these interests lose their force when the speech being suppressed is of a whistle-blowing character, such as with the MIOSHA violations in the instant case. Plaintiffs contend that although workplace harmony and efficiency are generally legitimate employer interests, disruption caused by the exposure of governmental wrongdoings does not impair those interests. This is so because the disruption caused by whistle-blowing, in the long view, promotes the public services provided by the employer.

---

3. *See also Swartzwelder v. McNeilly*, 297 F.3d 228, 231–32, 235–36 (3rd Cir.2002) (applying *NTEU* standard to police department policy that required all police communications to public to be cleared by Chief of Police); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749–50 (7th Cir.1999) (applying *NTEU* to police department policy barring discussion of intra-Departmental complaints); *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1211 (9th Cir.1996) (applying *NTEU* to workplace restrictions on religious advocacy).

Plaintiffs next assert that even if Frenchtown could show actual injury to its Fire Department caused by Plaintiffs' possible speech, there is no evidence that the restrictions are geared to alleviate this injury. First, Plaintiffs allege that the restrictions are overinclusive because they suppress more speech than that which could arguably be legitimately be suppressed (i.e., preventing disclosure of confidential information, or unauthorized communications "on behalf of" the fire department). More importantly, however, Plaintiffs charge that if previous statements by Frenchtown are to be believed, the restrictions will not be effective in their purported goal at all. Specifically, Plaintiffs refer to Frenchtown's prior insistence that the Ordinance only reaches communications with the media, and argue that leaving firefighters free to talk to individual members of the general public would leave open the same potential problems of workplace disruption and inefficiency.

Frenchtown responds that its Fire Department is a para-military organization, and that firefighters must be prevented from being able to comment without supervision on Fire Department performance. Specifically, Frenchtown alleges that such license would "impair discipline by superiors, have a detrimental impact on close working relationships... impede the performance of the speaker's duties, *and* impair harmony among co-workers by destroying morale and confidence." Def. Br. at 12. Frenchtown then cites several cases that it claims support the balancing of interests in this case in its favor.

No Sixth Circuit panel has yet considered the issue of application of the *NTEU* standard to a government employer restriction on employee speech. The Supreme Court's reasoning in *NTEU*, however, is instructive. In *NTEU*, Congress imposed a total ban on federal employees receiving compensation for making speeches or writing articles, and the Supreme Court struck the ban down as unconstitutional. *NTEU*, 513 U.S. at 457, 115 S.Ct. 1003. Congress argued first that the ban was crafted to prevent any appearance of government officials abusing their offices by being paid for unofficial activities, in return for possible improper influence. *Id.* at 472, 115 S.Ct. 1003. The *NTEU* court found this interest theoretically compelling, but pointed out that there was no evidence that the honoraria were actually inducing any malfeasance, and that it was implausible that they would ever induce malfeasance with lower-level public officials who had no influence to peddle. Thus, *NTEU* instructs that the government must come forward with actual evidence of harm to its interests, not merely a theory of some potential threat. Furthermore, the *NTEU* court found the honoraria ban underinclusive because it allowed some kinds of non-expressive honoraria. The Supreme Court deemed such loopholes to undercut the government's argument that an honoraria ban was necessary to further its interests: specifically, the importance of banning honoraria to preserving the appearance of governmental propriety was belied by the exception of some kinds of honoraria from the ban. Accordingly, *NTEU* also holds that when examining whether a government's restriction promotes a particular interest, an important consideration is whether the restriction continues to allow conduct that would undermine the interest purportedly served by the restriction.

Plaintiffs are correct that Frenchtown has provided no evidence that its interests are seriously threatened by the speech it seeks to restrict. Frenchtown offers hypothetical reasons why its restrictions might help the Fire Department, but its justifications are vague and generalized,

like those rejected by the *NTEU* court. Frenchtown does not offer any proof, i.e., from the days before the Ordinance, that allowing the speech currently restricted would impair discipline or intra-Departmental relationships. Once again, looking at the law from other Circuits using the *NTEU* test is instructive. In *Harman*, the Second Circuit considered a Rule of the New York Administration for Children's Services (ACS) that forbade employees from talking to the media without first getting their statements cleared by the ACS Media Relations Office. *Harman*, 140 F.3d at 116. The ACS justified its rule as a way to protect against inadvertent disclosures of confidential information, but the *Harman* court rejected this argument on the grounds that there was no evidence that inadvertent disclosure would even happen, let alone be a problem. *Id.* at 123. Similarly, the Ninth Circuit struck down a workplace restriction on religious speech because the government could not show that its interests of workplace efficiency and promoting a religion-neutral image were actually undermined by the religious speech. *Tucker*, 97 F.3d at 1211–14. Even if Frenchtown could show some actual injury to the atmosphere in the Fire Department, this injury would not be sufficient to keep the firefighters from speaking about MIOSHA violations, for example. The firefighters could not be kept from whistle-blowing because tension in the workplace is recognized as a natural consequence of employees holding their

employers accountable for acting unlawfully. *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 748 (9th Cir.2001). *See also Charvat*, 246 F.3d at 618 (expressing concerns with the lawful behavior of a government agency promotes the provision of government services).

Plaintiffs are also correct that the underinclusiveness of the restrictions cast doubt on their ability to promote the interests cited by Frenchtown. As explained above, the *NTEU* court found the existence of exceptions and loopholes to the honoraria ban persuasive evidence that the ban would not actually further the appearance of governmental propriety. This same reasoning has been adopted by the Circuit Courts.[4] In conclusion, not only does Frenchtown fail to show that its interests would be compromised without its restrictions, but the poor fit between its restrictions and its asserted interests put in doubt the justificatory force those interests provide for the restrictions.

Frenchtown's citation of caselaw is unavailing. First, Frenchtown cites *Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir.1991), for the proposition that a restriction on employee speech can be justified to prevent inefficiency and disharmony in the workplace. *Meyers* actually works against Frenchtown, however, because the Sixth Circuit in that case went on to strike down Cincinnati's conduct on the grounds that there was no evidence of any inefficiency, disruption or disharmony

---

4. *E.g., Swartzwelder*, 297 F.3d at 238–241 (prohibition on unauthorized release of opinions to public did not further proffered governmental interests because release of facts was still allowed and would undermine those interests to the same extent as opinions); *Latino Officers*, 196 F.3d at 467 (police department's interest in minimizing its association with other organizations did not justify prohibition on allowing its officers to march in uniform for an "unrecognized" organization,

because the department *did* allow its officers to march in uniform for other "recognized" organizations); *Sanjour*, 56 F.3d at 95 (EPA policy barring its employees from receiving compensation for speaking about EPA without agency approval could not be justified on grounds of preserving image of governmental propriety, because same interest remained threatened by allowing them to speak *with* agency approval).

caused by the plaintiff's speech. Here, as discussed before, Frenchtown also has failed to provide evidence of actual harm that would be caused by Plaintiffs' speech. *See also Melton v. City of Oklahoma City,* 879 F.2d 706, 715–16 (10th Cir.1989) (ruling against employer because there was no evidence that plaintiff's speech caused actual disruption).

Frenchtown cites other cases in which the courts *did* side with government employers, but two of these cases predated *NTEU* and used different standards for balancing. For example, the court in *Shands v. City of Kennett,* 993 F.2d 1337, 1344 (8th Cir.1993), sided with the City because it did not require any evidence of actual disruption to the workplace to count that as an interest in the City's favor. *See also Hanneman v. Breier,* 528 F.2d 750, 754 (7th Cir.1976). Frenchtown's two other cited cases are distinguishable because they ruled for the employers only after finding evidence of actual and severe disruption of public services stemming from the plaintiffs' speech. *Lytle v. City of Haysville, Kan.,* 138 F.3d 857, 867 (10th Cir.1998) (plaintiff's actual breach of police department's confidentiality rules undermined co-workers' confidence in plaintiff, disrupting departmental effectiveness by causing co-workers to shun his assistance); *Bryson v. City of Waycross,* 888 F.2d 1562, 1567 (11th Cir.1989) (evidence that plaintiff's constant complaints undermined police department morale, and even motivated some co-workers to avoid the department entirely because of the negative atmosphere). Thus, none of Frenchtown's cited caselaw salvages the constitutionality of its restrictions.

---

**5.** Frenchtown also complains that Plaintiffs could have avoided litigation by seeking redress through Frenchtown's administrative procedures, but does not explicitly make any argument that Plaintiffs are precluded from litigating by their failure to exhaust. In any case, as Plaintiffs point out, Frenchtown cites no law that obligates Plaintiffs to have exhausted Frenchtown's administrative procedure before litigating, and so Frenchtown's point is of no import.

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary Judgment.[5]

IT IS SO ORDERED.